**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                     No.  CR-07-0699 MV

BLANCA DEL-ROCIO GUERRERO and
JULIO MARISCAL GUTIERREZ,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Blanca Del-Rocio Guerrero's ("Defendant Guerrero") and Defendant Julio Mariscal Gutierrez' ("Defendant Mariscal") Joint Motion to Suppress ("Motion") **[Doc. No. 26]**, filed May 10, 2007.  The government filed a response ("Response") and a supplemental response ("Supplement").  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that Defendants' Motion is not well taken and will be **DENIED**.

## BACKGROUND

On March 19, 2007, Defendants were traveling by bus from Los Angeles, California to Atlanta, Georgia, for the purpose of delivering four pieces of luggage for a third party in exchange for being paid $2000.  Defendant Mariscal was in charge of a Blue Bovano suitcase ("Bag I"), which had a claim tag bearing the name Julio Mariscal and an emergency tag bearing Defendant Guerrero's name and phone number.[1]  Transcript of Suppression Hearing, dated 8/21/07 ("Tr. II"), p. 10.  *See also*, Govt's Exs. 1,4.  Defendant Guerrero also admitted to having two bags, a blue one ("Bag II")

---

[1]Defendants explained that Defendant Guerero's name and number were on this tag because her phone worked in the United States and Defendant Mariscal's did not.  Tr. II, pp. 10, 42.

and a black one, each with her name on the claim and emergency tags.  Tr. II, p. 41.  *See also*,

Govt's Exs. 2-3.  Although Defendants deny knowing the contents of the luggage that they were

delivering, they both admit that they knew the luggage contained "something bad."  Tr. of Post-

Arrest Interview of Defendant Mariscal, p. 21; Tr. of Post-Arrest Interview of Defendant Guerrero,

p. 15.   After arriving at the Albuquerque Greyhound Bus Station on an eastbound bus at

approximately 10:15 a.m., Defendants and the other passengers disembarked and the bus entered

the service area of the station.  The Defendants had approximately one hour before the bus boarded

again, during which time they ate a meal in the bus terminal.

On that same date, Albuquerque DEA Task Force Officers (TFO) Will Dorian and Jeremy

Bassett were at the Albuquerque Greyhound Bus Station conducting drug interdiction operations.

After the bus on which Defendants were traveling pulled into the service area, Officer Bassett

deployed his canine, Blaze, to check the luggage compartment of the bus.  Blaze alerted on two blue

"Bovano" brand suitcases (Bag I and Bag II), which were next to each other in the luggage

compartment.  Officer Bassett examined the bags and noticed that both originated from the same

location and were going to the same destination.  Officer Bassett also noticed that both of the bags

had Greyhound emergency tags bearing the name "Rocio Guerrero."   Additionally, Bag I had a

Greyhound claim tag in the name of "Juklio Mariscal"[2] and Bag II had a claim tag in the name of

"Rocio Guerrero".  Officer Bassett pulled Bag I, the suitcase bearing both names, from the luggage

compartment.  He chose this particular suitcase because he suspected it might belong to a husband

and wife who were traveling together.   Transcript of Suppression Hearing, dated 8/16/07 ("Tr. I"),

p. 53-54.  After the bus was serviced, it returned to the terminal and Bag I was placed alongside the

_____

[2]At the suppression hearing, Defendant Guerrero confirmed that "Juklio" was a misspelling
of his name, which is properly spelled "Julio."  Tr. II, p. 25.

bus, along with several other suitcases with different passenger names on them.  At that point, the passengers were allowed to re-board the bus.  The government's and Defendants' version of events diverge from this point.

### 1.    Government's Version

In order to determine who owned Bag I, as the passengers boarded the bus and after they handed their ticket to the bus driver, Officer Dorian would ask them if any of the bags placed alongside the bus belonged to them.[3]  Tr. I, p. 132.  Officer Bassett and Officer Dorian both testified that Officer Dorian asked every single passenger about the baggage.  Tr. I, pp. 57-58, 69, 132.  If a passenger identified a piece of luggage, Officer Bassett would ask for consent to search the bag.  Tr. I, p. 58.  If consent was granted, he would then conduct a search of the luggage.

Officer Dorian recalls he encountered Defendants after observing Defendant Guerrero hand the bus driver both of the Defendants' tickets (Tr. I, p. 133); and Officer Bassett first saw Defendants when "TFO Dorian . . . began to speak with them."  Tr. I, p. 60.  Officer Bassett recalls that Defendants were "standing very close to each other . . . like a husband and wife."  Tr. I, pp. 61, 137. When Officer Dorian encountered Defendants, he recalled introducing himself as a police officer to both Defendants and asking "if the bag was theirs in English."  Tr. pp. 60, 137.  When Defendants didn't answer Officer Dorian, he assumed they did not speak English, so he said

---

[3]Officer Bassett testified that this method was used to find the owners of the bag, rather than simply calling out the names on the bag and waiting for a response, because people will often check in bags under different names when they are carrying illegal contraband.  Tr. I, p. 90.

"policia"[4] and showed them his badge.[5]  Tr. pp. 61, 137.  Officer Dorian then asked "Tu maleta"[6]

and motioned to the bags alongside the bus, while maintaining eye contact with Defendants.  Tr. I,

pp. 61, 137-38.  Officer Bassett observed the Defendants looking at the luggage and talking to each

other in Spanish.  Tr. I, pp. 62-63.  Defendants then stepped out of line and took a few steps towards

Bag I, coming within a foot or two of the luggage.  Tr. I, pp. 63, 139, 190-91.  Officer Bassett

observed Defendant Guerrero "bend[] over and physically pick[] up both the nametag and the

Greyhound claim ticket [attached to Bag I] and . . . look[] at them."  Tr. I, p. 64.  Officer Dorian, on

the other hand, only observed Defendant Guerrero looking at the nametag on Bag I.  Tr. I, p. 140.

 Both Officer Dorian and Officer Bassett recall that while Defendant Guerrero was inspecting the

bag, Defendant Mariscal was standing behind her looking at the bags, although he never bent over

to look at the tags himself.  Tr. I, pp. 65, 140.  As they were looking at the bags, Officer Dorian

observed the Defendants talking to each other.[7]  Tr. I, p. 140.  Since he saw Defendants looking at

the bags, he again said "Tu maleta" to both of them while making eye contact with them.[8]  Tr. I, p.

141.   Officer Dorian recalls that, before responding, there was more discussion between the

---

[4]Although Officer Dorian meant to use the Spanish word for "police", as he actually pronounced the word, it had no meaning in Spanish.  Tr. I, p. 172.

[5]Officer Dorian testified that he showed his badge to each passenger.  Tr. I, p. 136.

[6]The Court took judicial notice of the fact that, translated into English, "Tu maleta" means "you suitcase".  Tr. I, p. 108.

[7]Officer Bassett testified that Defendants were in conversation before Defendant Guerrero bent over to inspect the bags.  The record is silent whether he observed them talking as they were looking at the bags.  Tr. I, p. 64.

[8]Officer Bassett observed Officer Dorian ask again if any of the bags belonged to them, however, Officer Bassett could not recall whether the question was asked in Spanish or English.  Tr. I, p. 65.

Defendants and both Officer Dorian and Officer Bassett recall that Defendant Guerrero responded "no" two to three times.  Tr. I, pp. 65, 142.

As to whether Defendant Mariscal responded, there is some inconsistency in the government's testimony. At the suppression hearing, Officer Dorian could not recall whether Defendant Mariscal responded or not.  Tr. I, p. 142.  In contrast, in affidavits prepared by Officer Dorian in support of the criminal complaint and search warrants in this matter, he averred that Defendant Guerrero and Defendant Mariscal both responded "no" when asked "Tu maleta?"  *See* Compl. Aff., p. 2; Search Warrant Aff., p. 3.  *See also* Tr. I, p. 166.  At the suppression hearing, Officer Dorian explained this discrepancy, stating that he thought Defendants were together as a couple and when Defendant Guerrero said "no" he believed she had the authority to answer for both of them and took that to mean that the luggage was not theirs.  Tr. I, pp. 145-146, 166, 176.

Likewise, at the suppression hearing, Officer Bassett testified that he did not observe Defendant Guerrero speak with Officer Dorian.[9]  Previously, however, Officer Bassett had testified that Defendant Mariscal had said "no" in response to inquiry regarding ownership of the bag.  Tr. I, p. 66.  Officer Bassett also provided an explanation for this inconsistency, stating:

> I described what I was observing and the body language, they were speaking to each other.  And which is commonly done almost every day.  One person will translate between the two of them or the family and answer for them.  That's what I believed

_____

[9]The United States filed a Supplemental Response to Defendants' Motion to Suppress, in which it stated that since filing its response Officer Dorian and Officer Bassett could not recall if both Defendants said "no" when asked if the suitcase belonged to them, or if only Defendant Guerrero said "no."  (Supplement, pp. 1-2.)  According to the Supplement, Officer Dorian asked both Defendants in Spanish if the suitcase belonged to them.  *Id.* at 2.  Defendant Guerrero "bent over, examined the tags on it, looked back at [Defendant] Mariscal, said something to him in Spanish, and stated to Officer Dorian, 'no, no, no.'"  *Id.*  Defendant Mariscal stood next to Defendant Guerrero as she did this.  *Id.*  Officer Bassett also heard Defendant Guerrero say "no, no, no" in response to Officer Dorian's question.  *Id.*  Officer Dorian does not recall whether Defendant Mariscal said "no" also, but understood Defendant Guerrero's response to be an answer for both Defendants.  *Id.*

was occurring at this time.  They were in constant communication with each other.
Both looking at TFO Dorian, both looking at the bags. . . . From what I observed, she
was speaking with her husband, which I believed to be her husband.  Looked at the
bags and then basically answered for both of them.

Tr. I, pp. 66-67.

Once Defendant Guerrero denied ownership of Bag I, she and Defendant Mariscal continued

to stand there as the other passengers boarded, prompting Officer Dorian to gesture towards the bus

and tell them in English that they could board the bus if none of the bags belonged to them.[10]  Tr.

I, pp. 67, 142.  Before re-boarding the bus, they were not asked to give consent to search any bags

because they did not claim ownership of any of the bags.  Tr. I, pp. 118, 145-46.

While it is clear that Defendant Guerrero then boarded the bus, the government's account

of what Defendant Mariscal did at that time is less clear.  In affidavits that Officer Dorian prepared

in support of the criminal complaint and search warrants in this matter, he wrote that after the

encounter with Officer Dorian, Defendant "Mariscal began to board the bus, then turned around and

proceeded to leave the bus and Greyhound property."  *See* Compl. Aff., p. 2; Search Warrant Aff.,

p. 3.  *See also* Tr. I, p. 168.  Also, at one point during the suppression hearing, Officer Dorian

testified that Defendants then "boarded the bus" (Tr. I, p. 143) but later in his testimony he explained

that he saw Defendant Mariscal "going towards the entrance" but could not remember "if he took

a few steps on or immediately left."  Tr. I, p. 153.  He further explained that when he "wrote the

report . . . [he] believed . . . that he did not get on the bus and that he had left the bus area" (Tr. I,

p. 169) but acknowledged that "[a]t that time, [he] was still interacting with some of the other

---

[10]Officer Bassett could not recall whether Officer Dorian used hand gestures to indicate they
could board the bus, as well.  Tr. I, p. 99.

passengers and [his] back was to the entrance.  So [he was] not sure if he stepped on briefly or if [Defendant Mariscal] just left after he was speaking with [him]."  Tr. I, p. 180.

A similar discrepancy occurred in Officer Bassett's testimony.  During his grand jury testimony, he testified that he saw both Defendants board the bus.  At the suppression hearing, however, he clarified this statement, explaining "I saw them boarding the bus.  I didn't physically see him take the step and see him pull himself inside, but he was standing beside her to go inside so to me, that's boarding the bus."  Tr. I, p. 93-94.

After the encounter with Defendants, Officer Dorian and Officer Bassett continued speaking with the rest of the passengers boarding the bus.  Tr. I, pp. 67-68.  None of the other passengers claimed Bag I, and Officer Dorian noted that Defendants were the only passengers who showed "somewhat of an interest" in it.  Tr. I, p. 103.  As for the other bags set alongside Bag I, they were all claimed by other passengers.  Tr. I, pp. 189-90.  After confirming with the bus driver that all of the passengers had boarded, the officers considered Bag I to be abandoned, since all of the bags had been claimed by passengers except for that bag.  Tr. I, pp. 68, 144-45, 190.  At this point, the officers searched Bag I and found what appeared to be crystal methamphetamine.  Tr. I, p. 69.

After searching the bag, the officers boarded the bus.[11]  Officer Dorian testified that as he was boarding the bus, he "thought back to [Defendants] because [he] remember[ed] them looking at the bags for a long time."  Tr. I, p. 148.  On entering the bus, Officer Dorian immediately encountered Defendant Guerrero standing in the aisle towards the rear of the bus.[12]  Tr. I, pp. 70-71,

_____

[11]Officer Bassett noted that when they boarded the bus, it was ready to leave and the door was already closed.  Tr. I, p. 70.

[12]Officer Bassett testified that normally when boarding a bus in such situations, officers will work from the rear of the bus forward because this "gives anybody the opportunity that doesn't want to speak with us to leave the bus if they want and it's just basically an officer safety issue."  Tr. I, p. 71.

148.  Officer Dorian asked her for her ticket in English at which time she walked to the middle of the bus and retrieved her tickets.  Tr. I, pp. 72, 148-49.   Officer Dorian looked at the name on the ticket and recognized it as one of the names on Bag I.  Tr. I, p. 72.  At that time, Officer Dorian also asked her, in English, "where the other guy was that was with her."  Tr. I, p. 150.  Officer Dorian testified that she kind of shrugged as if she didn't know, but Officer Dorian also admitted that she may not have been able to understand the question.  *Id*.  Officer Dorian then asked her to step off of the bus and, after retrieving some personal items, they exited the bus and she was placed in custody.  Tr. I, pp. 72, 74-75, 151.

Since the officers did not see Defendant Mariscal on the bus, Officer Dorian, Officer Bassett and another special agent went to look for Defendant Mariscal.  Tr. I, pp. 74-75.  Officer Dorian and the special agent proceeded on foot, and Officer Bassett set out in his car.  Tr. I, p. 75.  Officer Dorian testified that he walked north around the bus and towards the station and then proceeded towards the courtyard, located outside and in front of the bus station.  Tr. I, p. 151; Gov't Ex. 11. He observed Defendant Mariscal some distance from the station entrance at the corner of the Greyhound property and First Street, walking away from the bus station.  Tr. I, pp. 76, 155-56; Gov't Ex. 11.  Officer Dorian approached Defendant Mariscal and took him into custody without incident.  Tr. I, pp. 76, 155.  Meanwhile, Officer Bassett pulled his vehicle up to Officer Dorian and Defendant Mariscal and Defendant Mariscal was placed in the vehicle.  Tr. I, p. 77.  After taking Defendant Mariscal into custody, the officers returned to the bus and retrieved the second piece of luggage ("Bag II") on which Blaze had alerted and indicated.  Tr. I, pp. 77, 79.  Bag II was not immediately searched, as Officer Bassett decided to obtain a search warrant for it.  Tr. I, pp. 77-78. Officer Bassett and Officer Dorian explained that, as a general practice, when Blaze alerts on a piece of luggage that has not been abandoned, they will try to obtain consent to search that luggage.  Tr.

I, pp. 78, 183.  If consent is not granted, a search warrant is sought on the basis of the dog's alert.  *Id*.  In this case, since passengers were not given the opportunity to claim Bag II, they decided to obtain a search warrant for it.  Tr. I, p. 78.

With Defendants in custody, the officers proceeded to the Albuquerque District Office, where Defendant Guerrero was subjected to a search.  During the search, four Greyhound baggage claim tickets were found in the bag she was wearing around her waist.  Tr. I, pp. 157-58; Govt's Ex. 8-8e.  Once Officer Dorian was made aware of these claim tickets, he realized that there may be two bags in addition to the ones he had already seized.  Tr. I, pp. 79, 159. Since the bus had already left the Albuquerque station, state police officers were sent to Tucumcari, New Mexico, to retrieve the additional bags associated with Defendants' claim tickets.  Tr. I, pp. 123, 162; Compl., p. 4.  The additional bags were brought back to the District Office and placed in separate rooms.  Tr. I, p. 123. Blaze was deployed into the rooms and alerted and indicated to both bags.  Tr. I, p. 123.  At that point, Officer Bassett applied for search warrants.  Tr. I, p. 163.  Search warrants were obtained for Bag II and the two additional bags retrieved from Tucumcari.  *Id*.; Search Warrants attached as Exhibits to Govt's Supp. Resp.  All three bags were subsequently searched and discovered to contain methamphetamine.  Compl., p. 4.  Specifically, Bag II contained eleven plastic bags of crystal methamphetamine weighing a total of 2.75 gross kilograms.  *See* Bovano Search Warrant Return. The black suitcase in the name of "Rocio Guerrero" contained ten plastic bags of crystal methamphetamine weighing a total of 2.50 gross kilograms (*see* Protégé Search Warrant Return); and the second black suitcase in the name of "Juklio Mariscal" contained an additional ten plastic bags of crystal methamphetamine also weighing a total of 2.50 gross kilograms.  *See* Travel Gear Search Warrant Return.

2.      **Defendants' Version**

Defendant Guerrero's Version:

After lunching and waiting in the Albuquerque bus terminal for approximately an hour, Defendants determined that it was time to depart when they noticed other passengers that they had been traveling with forming lines.  Tr. II, pp. 5, 43, 61.[13]  Defendant Guerrero got in line to board the bus, with Defendant Mariscal behind her.  Tr. II, p. 43.  After the bus driver collected her tickets, Officer Dorian showed her his badge, said "policia" and then pointed at all the luggage and asked "Tu maletas?"[14]  Tr. II, pp. 44-46, 63.  After being asked "Tu maletas", Defendant Guerrero recalls that she approached Bag I and saw Defendant Mariscal's name on it and not her own, so she responded "no".[15]  Tr. II, pp. 44, 64.  She explained that "I told him, no, its not mine. . . . Because I was in charge of two pieces of luggage, and those had my name on them.  And since that one did not have my name on it, I assume, I thought, that they were going to ask him."[16]  Tr. II, pp. 46, 64.

As for her recollection of what Defendant Mariscal was doing, she does not recall whether Defendant Mariscal responded after Officer Dorian showed his badge or after he asked "Tu maletas", explaining that she did not look back at him.  Tr. II, pp. 48, 65, 68.  She also did not

---

[13]Defendants aver that they do not speak English and did not hear any announcements in Spanish advising them it was time to board the departing bus.

[14]Defendant Guerrero does recall that Officer Dorian spoke to her in English before speaking to her in Spanish, but states that she did not understand him when he spoke in English.  Tr. II, p. 44.

[15]She states that she only looked the claim tag with Defendant Mariscal's name on it and did not look at the tag bearing emergency contact information.  Tr. II, p. 46.

[16]In a statement made immediately after her arrest, Defendant Guerrero said she told Officer Dorian "No it's not mine . . . and I looked and I said mines [sic] are there."  Tr. of Post-Arrest Interview of Defendant Guerrero, p. 43.  At the suppression hearing, she explained that when she said "mine are there" she was referring to her bags that were loaded inside the luggage compartment of the bus.  Tr. II, p. 67-68.

observe whether he walked up to the bag with her (Tr. II, pp. 48, 65) and does not recall having any conversation with Defendant Mariscal while looking at the luggage. Tr. II, p. 66.

Regarding her own actions, after she told Officer Dorian "no" in response to "Tu maletas", he made a hand signal and she boarded the bus. Tr. II, p. 48. Defendant Mariscal followed a few steps behind her.[17] Tr. II, p. 48. After boarding the bus, Defendant Mariscal told Defendant Guerrero that he was going to the bathroom, and he got off the bus. Tr. II, p. 49. Defendant Guerrero recalls that she "waited for a few minutes then [she] looked out to see if he was going to hurry up because [she] thought that the bus was about to leave." Tr. II, pp. 49, 70. Then, she observed Officer Dorian and Officer Bassett board the bus. Officer Dorian approached her and she stated that he "told me a few things, but the only word that I understood that he asked me was, asking me for the tickets" because the English word for "ticket" is commonly used in Mexico. Tr. II, pp. 50, 71. When asked for her tickets, she retrieved them and handed them to Officer Dorian. Next, Defendant Guerrero's personal items were retrieved, and she was taken off the bus and placed in handcuffs. Tr. II, p. 51. She was then taken by vehicle to a place that she did not know, where she was eventually interviewed. Tr. II, p. 52.[18]

Defendant Mariscal's Version:

At the suppression hearing, Defendant Mariscal testified that as he approached the bus to re-board, he did notice various pieces of luggage alongside the bus but he testified that he believed the

_____

[17]She does not recall if Officer Dorian said anything more to her in English before he signaled for her to board the bus. Tr. II, p. 48.

[18]During the course of the interview, among other things, she stated that she was carrying two blue bags; however, at the suppression hearing she testified that she was carrying a blue bag and a black bag. When asked about this discrepancy and provided with a copy of the transcript from the interview, she insisted that she did not recall making that statement. Tr. II, p. 59.

-11-

handlers had taken them out, or that some additional passengers were boarding the bus.  Tr. II, p.

7.  Defendant Mariscal got in line, standing about a step or two behind Defendant Guerrero.  Tr. p.

9.  He testified that, while waiting in line he was reading a book.[19]  Tr. II, p. 9.  He recalled that there

were approximately three or four people ahead of him in line and about four people behind him in

line.  Tr. II, p. 9.  He also testified that, while waiting in line, he observed Officer Dorian standing

next to the bus; however, he never spoke with a police officer, nor did a police officer present him

with a badge and explain that he was a police officer.  Tr. II, pp. 9, 23, 34.  Moreover, he stated that

nobody ever pointed to a blue suitcase and asked him if it belonged to him and does not recall

whether Defendant Guerrero was questioned.  Tr. II, p. 23.  Also, initially at the suppression hearing,

Defendant Mariscal stated that he did not remember Defendant Guerrero stepping out of line, even

though he was right behind her, but later he stated that he believed that she did step out of line, but

he couldn't see her clearly because he was reading.  Tr. II, pp. 24, 34.

Defendant Mariscal testified that, after entering the bus, he left a small bag, earsets and his

book on the seat, told Defendant Guerrero that he was going to the bathroom and stepped off the

bus.  Tr. II, pp. 11, 27; Tr. of Post-Arrest Interview of Defendant Mariscal, p. 27.  Defendant

Mariscal explained that he did not go to the bathroom on the bus because based on his experience

as a bus driver he believed it was only to be used for emergency purposes when it was parked at the

terminal.  Tr. II, p. 11.  As he left the bus, he did not let the bus driver know where he was going

because the bus driver was not there.  Tr. II, p. 27.  Upon leaving the bus, he proceeded back to the

terminal; because the door that he went through to get to the bus was locked, he had to go through

another door to access the terminal.  Tr. II, p. 27.  Once inside the terminal he went to the bathroom;

---

[19] Defendant Guerrero also testified that he was reading a book while they were waiting in
line.  Tr. II, p. 68.

and after leaving the bathroom, he headed back towards the bus.  Tr. II pp. 12, 28; Tr. of Post-Arrest

Interview of Defendant Mariscal, p. 26.  He states that he was apprehended by an officer as he was

leaving the terminal and returning to the bus and denies being apprehended at the corner of the

Greyhound property and First Street, as alleged by Officer Dorian and Officer Bassett.  Tr. II, pp.

12, 29-32; Govt's Ex. 11.

Once apprehended he was taken by vehicle to "a jail" where he was later questioned.  Tr. II,

p. 14.

## DISCUSSION

Defendants argue the officers had no authority to search Bag I because it was not abandoned;

and they did not have permission or a warrant to search it.

Defendants state the following in support of this argument:

> Defendants Julio Mariscal-Gutierrez and Blanca Del-Rocio Guerrero's names were
> clearly denoted on the luggage in question.  Neither Defendant removed the name
> tags from the luggage or hid their identity or possessory interest in the luggage in
> any way.  Neither was asked for consent to perform a search of their luggage,
> though their names were clearly identifiable on the luggage, neither Defendant was
> directly or correctly asked anything concerning whether or not they claimed or
> disclaimed the luggage.

Motion, p. 6.

Moreover, Defendant Mariscal argues he "never even saw his luggage outside of the bus

as he entered the bus.  Indeed, it was not until he had already boarded the bus, unboarded [sic] the

bus to use the restroom at the bus station, and was going to re-board the bus when he was

confronted by a law enforcement officer and illegally detained."  *Id.* at 6-7.  Finally, Defendants

argue that when they boarded the bus they assumed "that their luggage– as denoted on their claim

checks– was going with them to their destination, without having been put on notice to the

-13-

contrary" which "negates the conclusion that they voluntarily relinquished any expectation of privacy in the luggage . . .". *Id.* at 7.

In response, the government does not claim that it had permission or a warrant to search Bag I; rather, it argues that Defendants affirmatively denied ownership of the suitcase. The government states that "TFO Dorian identified himself as a police officer and asked both defendants if the suitcase was theirs." Resp., p. 4. According to the government, in response to questioning about ownership of the luggage, Defendant Guerrero looked at the suitcase, examined the tags, and said "no, no, no." Supplement, p. 2. The government points out that even if Defendant Mariscal did not affirmatively deny ownership of the suitcase, which the officers cannot recall, his actions constituted an intent to abandon the suitcase. *See id.* Defendant Mariscal stood next to Defendant Guerrero while she examined the suitcase. *Id.* After Defendant Guerrero denied ownership of the suitcase, Defendant Mariscal "abandoned not only his suitcase containing jeans and methamphetamine, but also his traveling companion and the bus itself when he walked away from the bus station property as his bus prepared to depart." *Id.* The government argues that the actions of both Defendants clearly manifested their intent to abandon the suitcase. Once Defendants abandoned the suitcase, they had no reasonable expectation of privacy in the suitcase, and the officers were free to search it. Resp., p. 5.

Additionally, the government argues that the "searches of the other three suitcases had nothing to do with the abandoned suitcase. They were searched pursuant to duly executed search warrants based on probable cause established by K-9 alerts." Supplement, p. 4. The government claims "there is no fruit of the poisonous tree issue, because the search of those suitcases was based on evidence obtained independent of the abandoned suitcase." *Id.*

-14-

Finally, the government argues in the alternative that the evidence found in the suitcase at issue would have been inevitably discovered. *Id.* The government claims that "[e]vidence found as a result of illegal police conduct that inevitably would have been lawfully discovered absent the illegal conduct need not be suppressed." *Id. citing Nix v. Williams*, 467 U.S. 431, 440-44 (1984). Therefore, even if the Court were to find that the officers' search of Bag I was illegal, the government claims the officers would have obtained a search warrant for it based upon the dog's alert as it did with the other three suitcases. *Id.* Therefore, the government claims the evidence should not be suppressed.

## I.    Abandonment

In *Abel v. United States,* 362 U.S. 217, 241 (1960), the Supreme Court declared that the government's warrantless seizure of abandoned property did not violate the Fourth Amendment. *See also United States v. Hernandez,* 7 F.3d 944, 947 (10th Cir. 1993). "The test for abandonment is whether the defendant has retained any reasonable expectation of privacy in the property." *United States v. Ojeda-Ramos*, 455 F.3d 1178, 1187 (10th Cir. 2006) (*quoting Hernandez*, 7 F.3d at 947). When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had. *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir. 1983). "Abandonment is akin to the issue of standing because a defendant lacks standing to complain of an illegal search or seizure of property which has been abandoned." *Ojeda-Ramos,* 455 F.3d at 1187 (*quoting United States v. Garzon*, 119 F.3d 1446, 1449 (10th Cir. 1997)). "The inquiry is one of intent and subsumes both a subjective and objective component." *Id.* (*citing Garzon*, 119 F.3d at 1449).

Intent may be inferred from words, acts and other objective facts. *See Hernandez,* 7 F.3d at 947 (citations omitted); *Jones,* 707 F.2d at 1172; *see also United States v. Florez*, 871 F.Supp.

1411, 1414 (D.N.M. 1994). "Every case in which the Tenth Circuit has found abandonment involved a situation in which the defendant either (1) explicitly disclaimed an interest in the object, or (2) unambiguously engaged in physical conduct that constituted abandonment." *Garzon,* 119 F.3d at 1452. Furthermore, the Tenth Circuit has held that "one who disclaims ownership is likely to be found to have abandoned ownership. Phrased another way, disclaiming ownership is tantamount to declaring indifference, and thus negates the existence of any privacy concern in a container's contents." *United States v. Denny*, 441 F.3d 1220, 1227 (10th Cir. 2006) (citations omitted). In *Denny*, the Tenth Circuit notes that it has not found any case in which "a defendant's express disclaimer of ownership in response to a lawful police inquiry did not constitute abandonment of property in the Fourth Amendment context." *Id.*

> **a.    Defendant Guerrero**

In this case, although several facts are in dispute, Defendant Guerrero's verbal denial of ownership of Bag I is not. Officer Dorian identified himself to Defendant Guerrero in Spanish by displaying his badge and stating "policia," he then pointed to the suitcase and asked her "Tu maleta?" In response to this question, the government claims Defendant Guerrero examined the bag and its luggage tags, and then said "no, no, no." Compl., p. 2; Aff., p. 3. In fact, Defendants do not dispute that Defendant Guerrero said "no" in response to Officer Dorian's question. Although there is some question as to whether Officer Dorian used the proper Spanish words and pronunciation to express himself, Defendant Guerrero admits that when asked "Tu maleta" she approached Bag I, and after observing Defendant Mariscal's name on it, responded "no". Tr. II, pp. 44, 64. She explained that she said "no" because it was not her bag. *Id*.

Defendants try to circumvent this unambiguous denial of ownership by asserting that because the suitcase had luggage tags with both of their names on it, and because neither Defendant

-16-

tried to conceal their identity or remove the tags, they "unambiguously claimed ownership" of the bag.  Motion, p. 6.  Moreover, Defendants state that when they boarded the bus, they assumed their luggage would be going with them as denoted on their claim checks; and therefore did not relinquish any expectation of privacy in the luggage.  Motion, p. 7.

Defendants' argument is contrary to well-established Tenth Circuit precedent.  Defendants do not contradict the government's claim that Defendant Guerrero examined the suitcase and its luggage tags in response to Officer Dorian's question "Tu maleta?"  Defendants do not even claim Defendant Guerrero did not understand Officer Dorian's question, but instead argue it was incorrectly stated.  Therefore, Defendant Guerrero's actions indicate she understood Officer Dorian's question, and responded "no, no, no" in an effort to deny ownership of the suitcase later found to contain methamphetamine.  The fact that the suitcase had a luggage tag bearing Defendant Guerrero's name is not a sufficient assertion of ownership, especially when Defendant Guerrero examined the luggage, but nonetheless denied that the bag belonged to her.  *See Ojeda-Ramos*, 455 F.3d at 1179-81 (defendant abandoned suitcase by denying it belonged to him, even though the suitcase had a tag bearing his name).

Defendants incorrectly argue the present case is similar to another case decided by this Court, *United States v. Florez*, 871 F.Supp. 1411 (D.N.M. 1994).  In *Florez*, a canine alerted to two suitcases located in the common luggage area of an Amtrac train.  Unable to make out the name on the luggage tags, the officers made three announcements over the intercom describing the suitcases and asking the owner to come forward to the luggage area.  When no one responded to the announcements, the officers treated the suitcases as abandoned and seized them.  Subsequently, the defendant went to retrieve his suitcases at his stop only to discover they were gone.  The court found that: 1) the defendant never affirmatively denied ownership of the suitcases; 2) there was no

proof that he even heard the announcements; and 3) his effort to retrieve his suitcases indicated he did not intend to relinquish his ownership interest in the suitcases. Therefore, this Court found the suitcases had not been abandoned, and the officers had no authority to seize them.

The facts in this case are very different from *Florez*. Here, Defendant Guerrero was directly approached and questioned about the Bovano suitcase. Unlike in *Florez*, Defendant Guerrero affirmatively denied owning the suitcase in response to direct police questioning. The law is clear that when a defendant affirmatively denies owning property in response to a lawful inquiry, the defendant no longer retains any expectation of privacy in the property. *See Denny*, 441 F.3d at 1227 (citations omitted). In this case, Defendants do not challenge Officer Dorian's questioning or claim that Defendant Guerrero's denial of ownership was the result of a Fourth Amendment violation. *See Ojeda-Ramos*, 455 F.3d at 1187 (police pursuit or investigation at the time of abandonment does not itself render the abandonment involuntary); *see also Denny*, 441 F.3d at 1228, n. 7. Therefore, based on the facts before the Court, Defendant Guerrero abandoned Bag I; and she has no standing to challenge the legality of the subsequent search and seizure of it.

**b.    Defendant Mariscal**

The facts regarding abandonment as to Defendant Mariscal are less straightforward and require this Court to engage in credibility findings. The government contends that Officer Dorian introduced himself to both Defendants and made inquiry about the bags in both Spanish and English, while maintaining eye contact with both Defendants. On the other hand, Defendant Mariscal denies that Officer Dorian ever addressed him and Defendant Guerrero testified that she was not sure what was happening with Defendant Mariscal, because she did not "look back." In fact, Defendant Mariscal denies any knowledge of any questioning by Officer Dorian, explaining that he was reading a book.

-18-

Moreover, even if Officer Dorian did directly address Defendant Mariscal, there is inconsistency over what response, if any, Defendant Mariscal gave.  According to the Affidavit in support of the search warrants and the Criminal Complaint, Officer Dorian and Officer Bassett said Defendant Mariscal also said "no" in response to Officer Dorian's question.  Aff., p. 3; Compl., p. 2.  However, since preparing the Affidavit and Complaint, neither officer can remember whether Defendant Mariscal actually said "no."  Tr. I, pp. 142, 66, Supplement, p. 2.

Given this inconsistency, the Court is unable to find with sufficient certainty that Defendant Mariscal explicitly denied ownership of Bag I.  However, as previously discussed, abandonment may be found not only where there has been an explicit denial of ownership, but also where an individual "unambiguously engaged in physical conduct that constituted abandonment." *Garzon,* 119 F.3d at 1452.

Here, Defendant Guerrero asserts he did not respond to any questioning by Officer Dorian and that his silence was not acquiescence, rather it was the result of being unaware of any questioning.  On the other hand, the officers assert that they understood Defendant Mariscal's conduct in standing silently next to Defendant Guerrero while she examined the suitcase and luggage tag and then denied ownership, to be acquiescence in her response.  Tr. I, pp. 66-67, 145-146, 166, 176.

Even though it is uncontested that Defendant Guerrero was standing in line directly in front of Defendant Mariscal, was questioned by Officer Dorian, stepped out of line, walked a few feet, inspected the bag, and told Officer Dorian that it was not her bag, Defendant Mariscal claims that

he was essentially unaware of any of these events.[20]  He suggests that the reason he was not aware of this scenario playing out in front of him was because he was reading a book.

First, given the fact that Officer Dorian understood he needed to speak with each passenger before concluding that any piece of luggage had been abandoned, the Court finds that it is unlikely that he would have allowed a passenger to continue reading his book as he was trying to make contact with him.  However, even assuming that Officer Dorian did not make direct inquiry to Defendant Mariscal, the Court finds that Defendant Mariscal must have had an awareness of the inquiry that was made.  Even when a person is not transporting something that he or she believes to be "something bad", a person waiting in line must have some basic awareness as to the movement of the person directly ahead of him in line, so that he knows when to move forward with the line.  When such an individual also shares a personal relationship with the person ahead of him, such as a boyfriend/girlfriend relationship as was shared by Defendants, an individual is likely to be even more attuned to the movement of that person.   Finally, and most importantly for the present case, Defendant Guerrero admitted that he did know he was carrying "something bad" in his luggage.  It simply is not credible that Defendant could have been completely oblivious to the activity regarding the luggage taking place right in front of him, particularly given what he had at stake regarding his own luggage.  The Tenth Circuit has long maintained that "one may not willfully and intentionally remain ignorant of a fact, important and material to his conduct, and thereby escape punishment. The test is whether there was a conscious purpose to avoid enlightenment."  *United States v. Delreal-Ordones*, 213 F.3d 1263 (10th Cir. 2000) (internal

---

[20]Initially at the suppression hearing, Defendant Mariscal stated that he did not remember Defendant Guerrero stepping out of line, even though he was right behind her, but later stated that he believed that she did step out of line, but he couldn't see her clearly because he was reading. Tr. I, pp. 24, 34.

quotations omitted).  Here, given the actions taking place within a few feet of him, Defendant Mariscal must have either known or deliberately chose not to have known, that inquiry was being made regarding ownership of the luggage at issue.  Even if his lack of English skills may have dissuaded him from attempting to communicate with Officer Dorian, it would have been natural for him to try to find out what was going on from Defendant Guerrero.  The Court finds that under these circumstances, the assertion that Defendant Mariscal's silence indicated acquiescence is more credible than the assertion that he was just oblivious to what was going on, particularly in light of the fact that Defendant Guerrero knew he was carrying "something bad."  Thus, although Defendant Mariscal did not explicitly disclaim an ownership in the bag, his acts and other objective facts presented in this case were "tantamount to declaring indifference."  *Denny*, 441 F.3d at 1227.

Standing alone, this denial of interest in the luggage makes a compelling case for a finding that Defendant Mariscal abandoned the luggage in question; however, a finding of abandonment is further bolstered by Defendant Mariscal's actions in leaving the bus after re-boarding in Albuquerque.  While there was some inconsistency about whether Defendant Mariscal got on the bus and then got off the bus or if he just walked away from the bus before he even boarded, what is undisputed is that Defendant Mariscal left the bus soon before it was to depart the bus station.  While Defendant may not have known exactly how long there was until the bus departed, common sense would dictate that a bus is likely to depart soon after the passengers have boarded.  Defendant Mariscal claims that the reason he left the bus was to go use the bathroom, and Defendant Guerrero testified that he told her that this was where he was going when he got off of the bus.

-21-

In reality, it is difficult for this Court to imagine that a passenger with limited funds would risk missing a bus that was traveling a distance as great as the Defendants were traveling.[21]  It is even more difficult to imagine where, as here, the passenger risks missing the bus that is carrying cargo that he is being paid $2000 to successfully deliver.  Rather, it is likely that a passenger in Defendant Mariscal's situation would suffer a fair amount of discomfort before taking that risk.

Here Defendant Mariscal had access to a bathroom during the hour that he waited in the bus terminal.  Tr. I, pp. 198-99.  Moreover, Defendant knew there was a bathroom on the bus.  Even if the Court accepts Defendant Mariscal's explanation that he believed the bathroom was only for emergency purposes, his testimony also shows that he believed this limitation only applied while the bus was parked at the terminal.  Tr. II, p. 11.  So, based on his understanding, he would have only had to wait for the bus to depart to use the bathroom.  This would have been a more logical choice given what Defendant Mariscal had at stake by leaving the bus.  With these facts, the Court finds that the more credible explanation is that Defendant Mariscal fled from the bus in response to the luggage being scrutinized, thus abandoning Bag I.  *See Garzon,* 119 F.3d at 1452 (abandonment may be inferred from defendant's physical conduct).

In further support of this conclusion, the Court finds credible Officer Dorian's testimony, as supported by Officer Bassett's testimony, that Officer Dorian encountered Defendant Mariscal at the corner of the Greyhound property and First Street, walking away from the bus station.  Given these circumstances, Defendant Mariscal's action in leaving the terminal indicated he did not intend to return to the bus and continue on his trip, but instead wanted to distance himself from the suitcase containing methamphetamine.  *See Hernandez*, 7 F.3d at 947 (defendant abandoned

---

[21]Defendant testified that when he walked away from the bus he was only carrying approximately $10 and 300 Mexican pesos.  Tr. II, p. 38.

backpack by failing to claim it in response to police questioning and distancing himself from it physically); *see also Jones, supra.* By abandoning Bag I in this fashion, Defendant Mariscal did not retain a reasonable expectation of privacy in the suitcase and he lacks standing to challenge the legality of the search and seizure of Bag I.[22] *See Ojeda-Ramos*, 455 F.3d at 1187.

## II.    Inevitable Discovery

Even if the Court agreed that Bag I had not been abandoned, the methamphetamine found therein would have inevitably been discovered as a result of the dog alert, upon which search warrants were subsequently obtained.

The inevitable discovery doctrine allows for the admission of unlawfully seized evidence when an independent investigation inevitably would have led to the discovery of the evidence. *See Nix v. Williams*, 467 U.S. 431, 440-44 (1984). In the present case, if the officers had not treated Bag I as abandoned and searched it on that basis, they would have pursued a search warrant for Bag I, as they ultimately did with the other three bags in Defendants' possession. *See* Tr. I pp. 78, 183. A search warrant for Bag I could have been issued solely on the basis of Blaze's alert, since the Tenth Circuit has consistently held that probable cause can be based exclusively on a dog's alert.[23] *See United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997) (listing multiple cases)*; United*

---

[22]As the Court has not found that the search and seizure was unlawful, it need not address Defendant's fruit of the poisonous tree argument regarding the remaining bags.

[23]At the suppression hearing, Defendants argued for the first time that the search warrants that were issued should be invalidated. This argument is based on the fact that in the affidavits in support of the search warrants, it was asserted that Defendant Mariscal had responded when Officer Dorian asked about Bag I, but subsequently, Officer Dorian and Officer Bassett testified that they did not recall Defendant Mariscal responding to questioning. However, even if statement about Defendant Mariscal's response were struck from the affidavits, the dog alert information standing alone supports a finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (the offending statement must be "necessary to the finding of probable cause" to justify voiding the search warrant).

*States v. Klinginsmith*, 25 F.3d 1507, 1510 (10th Cir.1994); *United States v. Sukiz-Grado*, 22 F.3d 1006, 1009 (10th Cir.1994); United States v. Ludwig, 10 F.3d 1523, 1527 (10th Cir. 1993). In this case, the affidavit in support of the search warrants provides more information than is even necessary by identifying the Blaze's training, experience and efficiency rating, as well as the fact that he alerted on the suitcases. *See Kennedy,* 131 F.3d at 1377 (the Tenth Circuit does not require an affidavit to include a complete history of a drug dog's reliability beyond a statement that the dog has been trained and certified to detect drugs).[24] This information alone establishes probable cause to issue a search warrant. *Id.; see also United States v. Ramirez*, 61 Fed.Appx. 595, 597 (10th Cir. 2003). Consequently, there is no basis for this Court to find the evidence seized pursuant to the search warrants should be suppressed, because even if the Court found that Bag I was unlawfully searched, it nevertheless finds that the methamphetamine therein would have been inevitably discovered pursuant to an independent investigation conducted through search warrants.

## CONCLUSION

Defendant Guerrero expressly disclaimed an interest in Bag I and Defendant Mariscal disclaimed an ownership interest in the bag through his actions. Therefore, they effectively abandoned Bag I and now lack standing to challenge the legality of the search and seizure of it. Moreover, even if the Court found that Bag I had not been abandoned, the evidence would still be admissible as it would have been inevitably discovered, in spite of the allegedly illegal conduct.

---

[24]The affidavit states that Blaze has a success rate of 85% or greater. The Tenth Circuit has held that even a drug dog with a 70-80% success rate meets the standard required for probable cause. *Kennedy*, 131 F.3d at 1378. At the suppression hearing, Defendants argued that Blaze was not reliable because he only alerted to two of Defendants' four bags, even though all four contained drugs. At most, this shows that Blaze has a tendency to under-alert on the presence of drugs, rather than being likely to alert to drugs that don't actually exist. Moreover, Officer Bassett testified that once Blaze alerted to the first two bags owned by Defendants, he was removed from the bus and, therefore, did not have the opportunity to alert to Defendants' other two bags, which were stowed below the bags that Blazed did alert on. Tr. I, pp. 48, 122-23.

IT IS THEREFORE ORDERED that Defendants' Motion to Suppress is **DENIED.**

DATED this 10th day of January, 2008.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE

Attorney for the United States
Stephen Gontis

Attorneys for Defendants:
Joe Romero, Jr.
Margaret Katz
Timothy Cornish
Roman Romero